**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**PADUCAH DIVISION**
**CIVIL ACTION NO. 5:13-CV-00173**


C.A. JONES MANAGEMENT GROUP, LLC,
GLOBAL BOOK RESELLERS, LLC,
TECHNOLOGY ASSOCIATES, INC.,
CHARLES A. JONES, and SARAH C. JONES,                Plaintiffs/Counterclaim Defendants,

v.

SCOTTSDALE INDEMNITY COMPANY,                         Defendant/Counterclaim Plaintiff.


## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon the Motion for Preliminary Injunction of Plaintiffs C.A. Jones Management Group, LLC ("C.A. Jones); Global Book Resellers, LLC ("Global Book"); Technology Associates, Inc. ("Technology Associates"); Charles A. Jones ("Mr. Jones"); and Sarah C. Jones ("Ms. Jones"). (Docket No. 13.) Defendant Scottsdale Indemnity Company ("Scottsdale") has responded, (Docket No. 17), and Plaintiffs have replied, (Docket No. 24.) This matter is now ripe for adjudication.

Because Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits and irreparable harm essential to warrant injunctive relief, their Motion for Preliminary Injunction (Docket No. 13) will be denied.


## BACKGROUND

This case arises from an insurance coverage dispute. In their complaint, Plaintiffs alleged that Scottsdale breached an insurance contract by failing to provide coverage in defense of two

federal court actions.[1]  The lawsuits at issue are *David Griffin v. Charles A. Jones, Sarah C. Jones, C.A. Jones Management Group, LLC, Global Book Resellers, LLC, Technology Associates, Inc., and John Doe Entities 1-10*, USDC WDKY, Case No. 5:12-cv-00163-TBR and *Robert H. Waldschmidt, Trustee v. C.A. Jones Management Group, LLC, Charles A. Jones, and Scott Wright*, USBC MDTN, Adv. Proc. No. 3:13-ap-90101.  Scottsdale denies coverage for these lawsuits and counterclaims for declaratory judgment seeking an order confirming that no such coverage exists.  (Docket No. 6.)

Plaintiffs now seek a preliminary injunction, requesting an order that Scottsdale is required to provide legal representation and coverage for these actions.  Plaintiffs claim that they will suffer immediate and irreparable injury in the absence of such coverage.  (Docket No. 13-1 at 1.)

## I.      Relevant terms of the Scottsdale Policy

Scottsdale insured issued a Business and Management Indemnity Policy ("the Policy") to C.A. Jones Management Group, LLC ("C.A. Jones") and several of its affiliates under Policy No. EKI3042564 ("the Policy").  Among the Policy's provisions is coverage for the benefit of the entities' directors and officers ("the D&O Policy").  The D&O Policy pays, among other losses,

> Loss of the Directors and Officers for which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period . . . and reported to the Insurer pursuant to Section E.1 herein, for any Wrongful Act taking place prior to the end of the Policy Period.

---

[1] The Complaint also raises claims that Scottsdale unlawfully engaged in bad faith settlement practices and has been unjustly enriched, but these claims are not addressed in the instant motion. Therefore, the only question before the Court is whether Scottsdale was required to provide a defense for Plaintiffs' prior lawsuits.

The Policy ran from July 1, 2011 to July 1, 2012 ("the 7/1/11 Policy"). A second Policy was issued to C.A. Jones on July 1, 2012 ("the 7/1/12 Policy"). Scottsdale alleges that the Policy was cancelled on November 27, 2012 for nonpayment of premium. (Docket No. 17 at 3.)

Both the 7/1/11 and the 7/1/12 Policies are "claims-made" policies; that is, in order to be covered, a claim must be made and reported during the applicable Policy Period for any alleged wrongful act that occurred prior to the end of the Policy Period. The Policy's Insuring Clause specifies that Scottsdale shall pay the losses:

> for which the Directors and Officers are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay by reason of **a Claim first made** against the Directors and Officers during the Policy period or, if elected, the Extended Period, **and reported to the Insurer** pursuant to Section E.1. herein, for any Wrongful Act taking place prior to the end of the Policy Period.

(Docket No. 17-2 at 22, D&O Coverage Section, ¶ A.1) (emphases added). The Insuring Clauses related to Company losses also require the claim to be reported during the Policy Period. (Docket No. 17-2 at 22; Docket No. 17-1 at 22.)

The Policy considers all related wrongful acts as one insurance claim that must be reported to Scottsdale during the Policy Period when the wrongful acts are first alleged.[2]

---

[2] Policy Section D.3 provides:

> All Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the Policy Period:
>
> a. the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made; or
> b. the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Section E.2 below.

(Docket No. 17-2 at 27-28, D&O Coverage Section, ¶ D.3.)

(Docket No. 17-1 at 27-28.)  The Notification section requires the Insureds to notify the Insurer of any claim no later than sixty days after the end of the Policy Period.[3]  If, during the Policy Period, the Insureds become aware of a Wrongful Act that may give rise to a future covered Claim and notify the Insurer as soon as practicable, any Claim arising out of the Wrongful Act will be deemed to have been made at the time that the Insurer received notice.  (Docket No. 17-1 at 28, D&O Coverage Section, ¶ E.2.)  The same section precludes coverage for costs incurred prior to the time that the Wrongful Act results in a claim.  (Docket No. 17-1 at 28, D&O Coverage Section, ¶ E.2.)

The Policy defines "Interrelated Wrongful Acts" as "all Wrongful Acts that have as a common nexus any fact, circumstance, situation, event transaction, cause or series of facts, circumstances, situations, events, transactions, or causes."  (Docket No. 17-1 at 23, D&O Coverage Section, ¶ B.6.)

A "Claim" includes "a civil proceeding against any Insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading." (*See* Docket No. 17-1 at 27-28, D&O Coverage Section, ¶ B.1(c), quoted *supra*; Docket No. 17-2 at 22, D&O Coverage Section, ¶ B.1(c), quoted *supra*.))  Neither Scottsdale nor the Plaintiffs dispute that Griffin II shares a common nexus of facts, circumstances, and events with *David Griffin v. Jones, et al.*, USDC WDKY, Case No. 5:12-cv-00033-TBR (hereinafter "Griffin I").

---

[3] Policy Section E.1 provides in relevant part:

> The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give Insurer written notice of any Claim as soon as practicable, but in no event later than sixty (60) days after the end of the Policy Period.

(Docket No. 17-1 at 28.)

Consequently, the two cases comprise a single Claim.[4] (*See* Docket No. 17-1 at 27-28, D&O Coverage Section, ¶ D.3, quoted *supra*.)

## II. Plaintiffs' litigation history

### a. Griffin I

Both Griffin I and Griffin II arise from a soured business relationship between David Griffin and Charles Jones. Griffin filed his first lawsuit (hereinafter "Griffin I") against C.A. Jones, Charles Jones, Sarah Jones, and affiliated companies. Griffin alleged that after he made investments into various entities owned and operated by Jones, Jones formed C.A. Jones Management to operate as the companies' management consultant and charged exorbitant consulting fees to the companies, rendering them nearly insolvent. He sued C.A. Jones Management, Charles Jones, Sarah Jones, and affiliated companies on February 28, 2012 for securities fraud, breach of fiduciary duty, fraud, misappropriation, breach of contract, and unjust enrichment. (*See* Case No. 5:12-cv-00033-TBR, Docket No. 1 (Complaint).) The parties ultimately stipulated to the suit's voluntary dismissal upon the appointment of Myles MacDonald as receiver to assume control over the companies' operations. (*See* Case No. 5:12-cv-00033-TBR, Docket No. 58 (Stipulation of Dismissal).)

Griffin I was filed against Plaintiffs on February 28, 2012. It accordingly falls within the 7/1/11 Policy Period, which ran from July 1, 2011 to July 1, 2012. Plaintiffs assert that they timely reported the Claim arising from Griffin I as required. (Docket No. 13-1 at 6, 9.) According to Scottsdale, Plaintiffs did not request that Scottsdale assume their defense or pay their costs during the pendency of Griffin I. (Docket No. 17 at 9.) Moreover, Scottsdale claims

that Plaintiffs stipulated to dismissal of the suit without ever notifying Scottsdale in violation of the Policy.  (Docket No. 17 at 9.)

### b.      Griffin II

Griffin filed a second lawsuit (hereinafter "Griffin II") against Plaintiffs on November 2, 2012, alleging that MacDonald exposed substantial red flags in the Jones companies' inventories. Among Griffin II's allegations are violations of copyright and trademark law; Griffin claims that SE Book Company and CBR purchased international versions of textbooks, rebound them and removed the copyright marks, and sold them as original U.S. editions.  Griffin also asserts that upon MacDonald's investigation, Jones fraudulently transferred the companies' inventories and assets to other entities.  (*See* Case No. 5:12-cv-00163-TBR, Docket No. 18 (Amended Complaint).)

### c.      The CBR Trustee case

*Robert H. Waldschmidt, Trustee v. C.A. Jones Management Group, LLC, Charles A. Jones, and Scott Wright*, USBC MDTN, Adv. Proc. No. 3:13-ap-90101 (hereinafter "the CBR Trustee case") echoes the allegations of Griffin II, contending that Jones constructed a scheme to improperly market international textbooks.  (*See* USBC MDTN, Adv. Proc. No. 3:13-ap-90101, Docket No. 1 at ¶¶ 33-39.)  Both the CBR Trustee case and Griffin II allege that Jones's actions violated the Copyright Act, the Lanham Act, and Federal Trade Commission regulations.

The Complaint in the CBR Trustee case was filed on March 3, 2013.  Scottsdale alleges that this date falls outside the 2012 Policy Period, over three months after the Policy was cancelled for nonpayment.  (Docket No. 17 at 10.)

**STANDARD**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Accordingly, "[t]he granting or denial of a preliminary injunction is within the sound judicial discretion of the trial court." *Mason Cnty. Med. Ass'n v. Knebel*, 563 F.2d 256, 260-61 (6th Cir. 1977).

The Sixth Circuit has enunciated four elements to be "carefully balanced" in determining whether to issue a preliminary injunction. *Mason Cnty. Medical Ass'n v. Knebel*, 563 F.2d 256, 264 (6th Cir. 1977):

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits;
2. Whether the movant has shown irreparable injury;
3. Whether the preliminary injunction could harm third parties; and
4. Whether the public interest would be served by issuing the preliminary injunction.

*Id.* at 261 (citations omitted). The *Mason County* criteria "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief." *Tate v. Frey*, 735 F.2d at 990 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d at 102 (6th Cir. 1982)). Rather, these factors "are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

Furthermore, "[d]espite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required such irreparable harm before an interlocutory injunction may be issued." *Friendship Materials, Inc. v. Mich.*

*Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982). To establish immediate and irreparable harm there must be an actual, viable, presently existing threat of serious harm. *Cabinet for Workforce Dev.*, 2012 WL 5289659, at *3 (citing *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Mass.*, 649 F.2d 71, 74 (1st Cir. 1981)). A plaintiff must show injury that is not remote or speculative, but is actual and imminent. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Abney*, 443 F.3d at 552. The injury must be of such imminence that there is a clear and immediate need for relief in order to prevent harm. *Evans v. Wilson*, 2011 WL 5509543, at *2 (W.D. Ky. Nov. 10, 2011) (citing *Wis. Gas. Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).

## DISCUSSION

## I.  Substantial likelihood of success on the merits

First, Plaintiffs must demonstrate that they have a substantial likelihood of success on the merits. Although no single factor is controlling when determining whether a preliminary injunction should issue, the likelihood of success on the merits is often the predominant consideration. *See Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) ("[A] finding that there is simply no likelihood of success on the merits is usually fatal."); *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("[W]hile, as a general matter, none of [the] four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed.").

With respect to this first element, the Sixth Circuit advises that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 22 F.3d 729, 739 (6th Cir. 2000);

*accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.").

Here, then, Plaintiffs must demonstrate that they will likely prevail on the coverage question at issue. Plaintiffs contend that Scottsdale is bound by the terms of the Policy to extend defense costs. Scottsdale, however, argues that, pursuant to the terms of the Policy, the Plaintiffs' claims are excluded. Therefore, the issue before the Court is essentially an insurance contract dispute. Accordingly, in order to determine whether Plaintiffs have demonstrated a substantial likelihood of success on the merits, the Courts must first analyze the Policy's disputed provisions.

### a.      Analysis of the insurance contract

The Court will apply Kentucky law to interpret this insurance contract. *See Meade v. Great Am. Assurance Co.*, 198 F. Appx. 475, 477 (6th Cir. 2006). Kentucky law dictates that "the construction and legal effect of an insurance contract is a matter of law for the court." *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 638 (Ky. 2008). To successfully recover based on a breach of contract, a plaintiff must demonstrate the existence and breach of a contractually imposed duty. *Lenning v. Comm. Union Ins. Co.*, 260 F.3d 574, 581 (W.D. Ky. 2001) (citations omitted). The Court will accord the insurance contract with its plain meaning and will look to its "true character and purpose, and the intent of the policies." *Peoples Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 113 F.3d 629, 636 (6th Cir. 1997). The Court construes any ambiguities in an insurance contract in favor of the insured. *Crutchfield ex rel. Crutchfield v. Transamerica Occidental Life Ins. Co.*, 894 F. Supp. 2d 971, 976 (W.D. Ky. 20212). But if the policy's terms are clear and unambiguous, the policy must be enforced as written. *Kemper Nat'l Ins. Cos. V. Heaven Hill Distilleries*, 82 S.W.3d 869, 873 (Ky. 2002).

### i.    The Griffin I claim

The Court must determine whether the Claims are covered before considering whether Policy limitations and exclusions apply.  Both Griffin I and Griffin II center upon allegations that Jones and his affiliates defrauded Griffin in conjunction with his business investments.  Neither Scottsdale nor the Plaintiffs dispute that the two lawsuits share a common nexus of facts, circumstances, and events and consequently constitute a single Claim.[5]  (*See* Docket No. 17-1 at 27-28, D&O Coverage Section, ¶ D.3, quoted *supra*.)  This Claim arose on February 28, 2012, prior to the commencement of the 7/1/2012 Policy in July; therefore, if the Claim is covered, it must be under the 7/1/2011 Policy.

The 7/1/2011 Policy unequivocally requires Insureds to comply with the sixty-day notification period "as a condition precedent to their rights to payment."  (Docket No. 17-1 at 28, D&O Coverage Section, ¶ E.1.)  Although Plaintiffs claim to have timely notified Scottsdale of the Griffin I claim, they have provided no documents or evidence to establish the date of notification.    Moreover, the documentary evidence provided by Scottsdale details each communication from Plaintiffs notifying, reporting, or advising Scottsdale of potential Claims related to this litigation; it does not reflect that Plaintiffs timely reported the Griffin I claim.  (*See* Docket No. 17-5 at 5-6 (listing all notices of claims received by Scottsdale for the relevant policy number related to Plaintiffs' Claims in the instant litigation).)  The relevant claim file demonstrates that Scottsdale received no notice of the Griffin I claim until September 25, 2012— a date exceeding sixty days following the end of the Policy Period and after the case's dismissal

on August 23, 2012.  (*See* Docket No. 19-1 at 32.)  This date was neither as soon as practicable nor within the sixty-day window following the 2011 Policy Period.

The Court's consideration hinges upon the distinction between an occurrence-based policy and a claims-based policy.  The policy issued by Scottsdale is a claims-made policy:  it provides coverage for any claim made against the insured during a certain period, regardless of when the incident giving rise to the claim actually occurred.  "Claims-made . . . policies are essentially reporting policies.  If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches."  *Trek Bicycle Corp. v. Mitsui Sumitomo Ins. Co., Ltd.*, 2006 WL 1642298, at *2 (W.D. Ky. June 7, 2006).  Such a policy is to be distinguished from an "occurrence" policy, which provides coverage for incidents that *occur* during the specified period, regardless of when the claim is made.  *Id.*

Nonetheless, since *Trek Bicycle Corp.* was decided, the Kentucky Court of Appeals has considered the notice-prejudice rule in the context of a claims-made policy, offering an indication of how the Kentucky Supreme Court would interpret the relevant state law.  *See Radford v. DVA Renal Healthcare, Inc.*, 2010 WL 4779927, at *5 (W.D. Ky. Nov. 16, 2010).  *AIG Domestic Claims, Inc. v. Tussey*, 2010 WL 3603844 (Ky. App. Sept. 17, 2010) involved similar facts to this case:  the insured party failed to notify its insurer of a claim until after its claims-made policy's expiration, instead reporting the claim during the "second" policy period initiated by its renewal of coverage.  The Court rejected the insurer's argument that the failure to timely report the Claim during the applicable reporting period left the insured without coverage.  Rather, the Court held that because the policy was renewed and there was no lapse in coverage, the insured enjoyed continual coverage.

Had a lapse in coverage existed, Scottsdale would likely have prevailed. However, "it is difficult to fathom that a claim accruing during the two policy periods would not be covered by either policy." *Id.* at *3. Accordingly, because Plaintiffs gave notice of the Griffin I claim in the second policy period, the *Tussey* analysis causes the Court to conclude that the Scottsdale Policy provided seamless coverage to Plaintiffs, rendering Griffin I a covered Claim.

### ii. Analysis of the Griffin II and CBR Trustee claims

A similar analysis applies to Griffin II, which also alleges that Plaintiffs defrauded Griffin and misappropriated his investments. Scottsdale alleges that because the second Griffin lawsuit arose out of the same facts, circumstances, situations, events, transactions, and causes as Griffin I, these matters constitute a single Claim as interrelated wrongful acts. The Court agrees.

Section D.3 of the D&O Policy provides that all Claims arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed to have been made at the earlier of either "the time at which the earliest claim involving the same Wrongful Act or Interrelated Wrongful Act is first made;" or "the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Section E.2." (Docket No. 17-1 at 27-8, D&O Policy, ¶ D.3(a).)

Because notice of Griffin I was valid, Griffin II is also covered, the two comprising a single Claim. Having determined that Plaintiffs notified Scottsdale of Griffin I on September 25, 2012, they will be deemed to have notified Scottsdale of Griffin II on the same date.

Finally, the CBR Trustee case is also an Interrelated Wrongful Act with Griffin I and Griffin II for the reasons discussed above. The CBR Trustee lawsuit was filed on March 4, 2013. Plaintiffs' July 1, 2012 Policy was cancelled for non-payment of premium effective November 27, 2012. Scottsdale argues that because the Claim was made after the Policy was cancelled, it is

consequently not covered. However, this argument fails to acknowledge that Griffin I was deemed to have been validly made, per *Tussey.* As explained *supra*, all Interrelated Wrongful Acts are covered under the policy in effect when the first Claim was received. (Docket No. 17-1 at 27-8, D&O Policy, ¶ D.3(a).) Accordingly, the CBR Trustee claim is deemed to have been made at the time of Griffin I and is also covered.

### b.    Potential preclusions to coverage and defense

Scottsdale points to numerous Policy limitations and exclusions that it argues preclude coverage. "While the mere possibility of coverage may trigger an obligation to defend, such obligation is not without limitation. Where a claim is the subject of a clear exclusion, there is no duty to defend." *Reliable Springs Co. v. St. Paul Fire & Marine Ins. Co.*, 869 F.2d 993, 994 (6th Cir. 1989). For the reasons explained below, Scottsdale's contractual obligation to provide coverage for Plaintiffs' claims in Griffin II and the CBR Trustee remains equivocal and uncertain.

### i.    Alleged material misrepresentations

Scottsdale argues that coverage is barred under the 2012 Policy based on a material misrepresentation. Section IV.1 of the 2012 Policy Application's General Information Section queries whether, in the last three years, "any person or entity proposed for this insurance has been the subject of or involved in any litigation, administrative proceeding, demand letter, or formal or informal governmental investigation or inquiry including any investigation by the . . . Equal Employment Opportunity Commission." (Docket No. 17-7 at 3.) Scottsdale contends that Plaintiffs failed to report the existence of the Griffin I lawsuit, an Equal Employment Opportunity Commission Claim, and a state court race discrimination lawsuit upon their 2012 Policy application. (Docket No. 17 at 18.)

Plaintiffs respond that any alleged misrepresentation was attributable not to Charles Jones, but instead to his insurance agent. Jones has submitted an affidavit indicating that although his signature appears on the application, the handwritten denial of involvement in litigation or other proceedings belongs to the agent. Jones further claims that he was unaware of the alleged misrepresentation and signed the application in good faith. (Docket No. 24-1.)

Kentucky law provides that "a misrepresentation voids an insurance policy if the misrepresentation is 'material' to the acceptance of risk or if the insurance company would not have issued the policy if the true facts had been made known." *Cont'l Cas. Co. v. Law offices of Melbourne Mills, Jr., PLLC*, 676 F.3d 534, 538 (6th Cir. 2012). This principle is grounded in the Kentucky Insurance Code, which explains that "[m]isrepresentations, omissions, and incorrect statements" on insurance applications prevent recovery if the statements are:

> (1) Fraudulent; or (2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

Ky. Rev. Stat. 304.14-110. Moreover, even an innocently made misrepresentations will defeat recovery on the policy issued if such representations are false and material to the insurer's risk. *Koch v. Owners Ins. Co.*, 2014 WL 299943, at *3 (W.D. Ky. Jan. 28, 2014).

However, "where an application is made out entirely by the agent of the insurer from his own knowledge, or fraudulently, and the insured, acting in good faith, signs the application without reading it or without knowledge of its contents, the company will be estopped to rely upon the alleged false statements contained therein." *Cook v. Life Investors Ins. Co. of Am.*, 126

Fed. Appx. 722, 724 (6th Cir. 2005) (quoting *Metro. Life Ins. Co. v. Trunick's Adm'r*, 54 S.W.2d 917 (Ky. 1932)). Therefore, "[t]he critical inquiry is whether an applicant for insurance acted in good faith when signing an application containing false answers placed there by an agent of the company." *Id.* at 625.

Jones's reliance upon the good faith exception raises a question of fact concerning his knowledge of the misrepresentation. Notwithstanding his self-serving affidavit, he has made no substantial showing that he signed the application innocently and in good faith. He makes no claims as to whether he informed the agent of the pertinent information and was misled, believing that his application reflected the truth—or whether he instead falsely claimed that no litigation was pending. The affidavit indicates only that Jones did not realize that the box had been checked "no" on this question. (Docket No. 24-1.) Moreover, there is no indication that the agent stopped Jones from reviewing the application before he signed it. *See Hornback v. Bankers Life Ins. Co.*, 176 S.W.3d 699 (Ky. App. 2005). While the Court believes that the facts lean slightly toward Scottsdale, at best, they do not clearly demonstrate a likelihood of success for Jones as to the misrepresentation.

### ii. The Insured v. Insured Exclusion

Scottsdale relies upon several exclusions enumerated in the Policy declining coverage. First, it points to the Insured v. Insured Exclusion, which provides:

> Insurer shall not be liable for Loss under this Coverage Section on account of any Claim:
> . . .
> e.      brought or maintained by, on behalf of, in the right of, or at the direction of any Insured in any capacity, any Outside Entity or any person or entity that is an owner of or joint venture

> participant in any Subsidiary in any respect and
> whether or not collusive . . .

(Docket No. 17-1 at 25, D&O Coverage Section, ¶ C.1(e).)

A Subsidiary includes any entity that is at least 50% owned by the Parent Company, either directly or indirectly.[6]  The Policy initially names C.A. Jones Management Group as the Parent Company, but Endorsement No. 2 amends this provision to include other entities as Parent Companies, including Integrated Computer Solutions, Inc. ("ICS") and Black Rock Investments ("BRI").  (Docket No. 17-1 at 47, Endorsement No. 2.)

Various filings in Griffin I and Griffin II indicate that David Griffin is a 50% owner of ICS and a 50% owner of BRI.  (Griffin II, Memorandum Op., Docket No 39 at 3.)  SE Book Company ("SEB") is owned by these two entities, with BRI owning 92% and ICS owning 8%. (Griffin II, Mem. in Supp. of Mot. To Dismiss Am. Compl., Docket No. 21-1 at 11.)  BRI and ICS also own College Book Rental, Company, LLC ("CBR") in similar proportions. Furthermore, Griffin owns securities in SEB and CBR directly.  (Griffin II, Mem. Op., Docket No. 39 at 4-5, 18.)

The Policy defines both SEB and CBR as Subsidiaries, as they are owned at least 50% by a Parent Company—that is, BRI.  Because Griffin is a 50% owner of BRI and ICS, he maintains indirect ownership of Subsidiaries SEB and CBR.  Further, he has invested substantial sums directly into both SEB and CBR pursuant to his ownership interest.  As an owner of a

---

[6] The Policy defines a Subsidiary as:

> any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company [i.e., C.A. Jones], directly or indirectly, if any such entity:
> i.    was so owned on or prior to the inception date of this Policy; or
> ii.   becomes so owned after the inception date of this Policy. . . .

(Docket No. 17-1 at 10, General Terms & Conditions Section, B.11.)

Subsidiary, any claim "brought or maintained by, on behalf of, in the right of, or at the direction" of him is excluded by the Insured v. Insured exclusion. Therefore, Plaintiffs are unlikely to overcome the argument that Griffin I, Griffin II, and the CBR Trustee case are excluded from coverage as interrelated Claims.

### iii. The Fraudulent and Criminal Acts Exclusion

The Policy also excludes Claims alleging dishonest, fraudulent, or criminal acts by the Insured. Specifically, it excludes coverage for any claims:

> f.    alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:
>
> > i,    any dishonest, deliberate fraudulent or criminal act of an Insured; provided, however, this exclusion f.i shall not apply unless and until there is a final judgment against such Insured as to such conduct; or
> >
> > ii.    the gaining of any profit, remuneration or financial advantage to which any Directors and Officers were not legally entitled; provided, however this exclusion shall not apply unless and until there is a final judgment against such Directors and Officers as to such conduct.

(Docket No. 17-1 at 25, D&O Coverage Section, ¶ C.1(f).)

Scottsdale argues that the Complaints against Jones and the Jones entities reflect allegations that fall squarely within this exclusion. (Docket No. 17 at 22.) Acknowledging that the Exclusion's explicit terms render it applicable only if a final judgment has issued against an Insured as to such conduct, Scottsdale points to the Stipulated Permanent Injunction against Charles Jones and C.A. Jones in *McGraw-Hill Cos., Inc., et al. v. Jones, et al.* (*See* Docket No. 24-2.) Scottsdale contends that the permanent injunction constitutes a final judgment against

Jones and C.A. Jones, because after its entry, all other claims were dismissed with prejudice. (Docket No. 17 at 23.)

In response, Plaintiffs argue that the permanent injunction cannot constitute a final judgment, as Plaintiffs did not admit to dishonest, fraudulent, or criminal acts and the Court made no such finding. (Docket No. 24 at 11.)

 "'In criminal cases, as well as civil, the judgment is final for the purpose of appeal 'when it terminates the litigation . . . on the merits and 'leaves nothing to be done but to enforce by execution what has been determined.'" *McNutt v. Cardox Corp.*, 329 F.2d 107, 109 (quoting *Berman v. U.S.,* 302 U.S. 211, 212-213 (1937)). The issuance of a permanent injunction in this case did not constitute a final judgment, as it did not "terminate the litigation on the merits." *Cunningham*, 527 US at 209. Although the Stipulated Permanent Injunction enjoined the Plaintiffs from participating in the alleged fraudulent activities in the future, they did not admit to having committed them in the past. Moreover, the *McGraw-Hill* Court drew no conclusion about whether Plaintiffs committed the alleged activity. (*See* Docket No. 24-2.)

Furthermore, the record before this Court does not reflect that the *McGraw-Hill* Court memorialized any final judgment in a separate document. Federal Rule of Civil Procedure 58 requires that "[e]very judgment . . . must be set forth on a separate document." Fed. R. Civ. P. 58(a)(1). Federal Rule of Civil Procedure 54(a) provides in part that "'Judgment' as used in these rules includes a decree and any order from which an appeal lies." Therefore, because the *McGraw-Hill* Order was not a "judgment" reduced to a written instrument under Rule 58, no final judgment issued. Accordingly, Section C.1(f) of the Policy does not exclude coverage.

### iv.     Publisher Exclusion

The Policy also provides that Scottsdale will not provide coverage for loss arising from of any claim:

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:
>
>> i.      the theft, conversion, infringement, improper duplication or misappropriation of idea, concept, copyright, trademark, trade name or literary property; or
>>
>> ii.     for false, misleading, defamatory, obscene or objectionable advertising or publication.

(Docket No. 17-1 at 84, Endorsement No. 37.)

Both the Griffin II and CBR Trustee cases allege that Jones purchased international versions of textbooks, rebound them, removed their copyright marks, and marketed them as U.S. editions.  (Griffin II, Am. Compl., Docket No. 18 at ¶¶ 68-75; CBR Trustee Case, Compl., Docket No. 1 at ¶¶ 33-39.)  Both cases allege violations of the Copyright Act, the Lanham Act, and Federal Trade Commission regulations.  Therefore, this provision excludes coverage for Griffin II and the CBR Trustee case.

As Plaintiffs point out, the actual claims involved in Griffin II involve securities fraud, breach of fiduciary duties, fraud, misappropriation, unjust enrichment, and constructive trust. (Docket No. 24 at 12.)  However, the alleged copyright violations play a critical role in the case's development.  Therefore, it is likely that Griffin II at least "directly or indirectly result[ed] from" these alleged violations.  Although some claims may be severable from the alleged copyright violations, the Publisher Exclusion at least severely undermines the Plaintiffs' right to coverage.

### v.      Intellectual Property Exclusion

An additional exclusion states that Scottsdale is not liable for Loss on account of any

Claim:

> alleging, based upon, arising out of, attributable to, directly or
> indirectly resulting from, in consequence of, or in any way
> involving,
>
> i.      any actual or alleged infringement,
>         misappropriation, or violation of copyright,
>         patent, service marks, trademarks, trade secrets,
>         title or other proprietary or licensing rights or
>         intellectual property of any products[.]

(Docket No. 17-1 at 27, D&O Coverage Section, ¶ C.2(b).)

This exclusion applies only to Insuring Clause A.3, which applies to the Loss of the

Company.  (Docket No. 17-1 at 27, D&O Coverage Section, ¶ C.2.)  As discussed *supra*, both

lawsuits at issue allege, are based upon, arise out of, are attributable to, directly or indirectly

result from, are in consequence of, or involve violation of copyright laws.  Although Scottsdale

remains liable for the Losses set forth in Clauses A.1 and A.2,[7] the exclusion leaves any Loss to

the Company stemming from these claims without coverage.

---

[7] Clause A.1 provides:

> The Insurer shall pay the Loss of the Directors and Officers for which the
> Directors and Officers are not indemnified by the Company and which the
> Directors and Officers have become legally obligated to pay by reason of a
> Claim first made against the Directors and Officers during the Policy Period, or,
> if elected, the Extended Period, and reported to the Insurer pursuant to Section
> E.1, herein, for any Wrongful Act taking place prior to the end of the Policy
> Period.

(Docket No. 17-1 at 22, D&O Company Coverage Section, ¶ A.1.)

Clause A.2 provides:

> The Insurer shall pay the Loss of the Company for which the Company has
> indemnified the Directors and Officers and which the Directors and Officers have
> become legally obligated to pay by reason of a Claim first made against the
> Directors and Officers during the Policy Period or, if elected, the Extended

### vi.    Securities Fraud Exclusion

Section C.1(n) excludes Claims:

> alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving: . . .
>
> > ii.    the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any Wrongful Act actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the Company.

(Docket No. 17-1 at 26, D&O Coverage Section, ¶ C.1(n).)

The Griffin II Amended Complaint's first count alleges securities fraud.  (Griffin II, Am. Compl., Docket No. 18 at ¶¶ 88-93.)    However, the exclusion's express terms limit its application to Wrongful Acts committed "subsequent to the consummation of an initial public offering" of the Company's securities.  (Docket No. 17-1 at 26, D&O Coverage Section, ¶ C.1(n).)  Because there have been no public offerings of the entities at issue, this exclusion does not bar coverage for Griffin's claims.

---

Period, and reported to the Insurer pursuant to Section E.1, herein, for any Wrongful Act taking place prior to the end of the Policy Period.

(Docket No. 17-1 at 22, D&O Company Coverage Section, ¶ A.2.)

### vii.    Coverage of Global Booksellers

Only Insureds enjoy coverage under the Policy's D&O Section. The Policy defines an "Insured" to include "the Company and the Directors and Officers." (Docket No. 17-1 at 23, D&O Coverage Section, ¶ B.5.) The term "Company" includes the Parent Company and any Subsidiaries. (Docket No. 17-1, Gen. Terms & Conditions Section, ¶ B.2.) Endorsements 2, 3, and 4 list an additional twenty-two entities that are also made "Parent Companies." (Docket No. 17-1 at 47-49.) None of the endorsements list Global Book Resellers, LLC as a Parent Company or otherwise as an Insured. Accordingly, no coverage exists for this entity.

### viii.    Coverage of Sarah Jones

As explained above, the Policy defines an Insured to include the Company's Directors and Officers. (Docket No. 17-1 at 23, D&O Coverage Section, ¶ B.5.) Although Sarah Jones is listed with the Kentucky Secretary of State as the corporate secretary for ICS, an insured entity, she has denied this allegation. (*See* Griffin I, Answer to Complaint, Docket No. 38 at ¶ C.) Therefore, Sarah Jones's status under the Policy is unclear.

### c.    The duty to defend

Plaintiffs have not demonstrated a "substantial likelihood" that it will succeed in proving that Scottsdale is contractually obligated to cover the Claims at issue. Therefore, their allegation that Scottsdale is subject to a duty to defend them in Griffin II and the CBR Trustee case is also speculative and uncertain. *See Reliable Springs*, 869 F.2d at 994-95 (explaining that if a claim is excluded from coverage, no duty to defend attaches).

Moreover, Endorsement No. 35 to the 2011 Policy, entitled "Non-Duty to Defend — Directors and Officers," unambiguously specifies that the duty to defend any Claim falls to the

Plaintiffs: "It shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim." (Docket No. 17-1 at 81, Endorsement 35, ¶ F.1.).[8] Endorsement 35 continues, "The Insurer shall not be liable for any settlement, Costs, Charges and Expenses, assumed obligation or admission to which it has not consented." Scottsdale has consented to no such settlements, costs, charges, or expenses assumed by Plaintiffs, including their defense costs for Griffin I, Griffin II, and the CBR Trustee case. The plain language of the Non-Duty to Defend provision explicitly states that Scottsdale is not liable for the expenses at issue. Scottsdale was required to advance Costs, Charges and Expenses for which coverage existed—but as discussed above, the Policy's exclusions and limitations render Plaintiffs unlikely to demonstrate that their Claims were covered.

Finally, Scottsdale alleges that Plaintiffs violated their obligation to inform Scottsdale of Griffin I under Endorsement No. 35, under which they agreed not to incur "Costs, Charges and

---

[8] Endorsement 35 provides, in relevant part:

F.   SETTLEMENT AND DEFENSE
  1.   It shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim.
  2.   The Insureds agree not to settle or offer to Settle any Claim, incur any Costs, Charges and Expenses or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the prior written consent of the Insurer, such consent not to be unreasonably withheld. The Insurer shall not be liable for any settlement, Costs, Charges and Expenses, assumed obligation or admission to which it has not consented. The Insurer shall have the right to investigate and settle any Claim; provided, however, no settlement shall be made without the consent of the Parent Company, such consent not to be unreasonably withheld. The Insureds shall promptly send to the Insurer all settlement demands or offers received by any Insured from the claimant(s).
  3.   The Insureds agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that, in the event of a Claim, the Insureds will do nothing that shall prejudice the position of the Insurer or its potential or actual right of recovery. The Insurer may make any investigation it deems necessary.
  4.   The Insurer shall, on a quarterly basis, advance on behalf of the Insureds covered Costs, Charges and Expenses which the Insureds have incurred in connection with Claims made against them, prior to disposition of such Claims. Any advancement of Costs, Chargers and Expenses shall be subject to the condition that such advanced amounts shall be repaid to the Insurer by the Insureds severally according to their respective interest if and to the extent the Insureds shall not be entitled to coverage for such Costs, Charges and Expenses under the terms and conditions of this Policy.

(Docket No. 17-1 at 81.)

Expenses" without Scottsdale's prior written consent. (Docket No. 17-1 at 81, Endorsement 35, ¶ F.2.) Scottsdale alleges that Plaintiffs received service of the Griffin I Complaint, defended the litigation, and ultimately settled the Complaint, all without notifying Scottsdale. Indeed, as discussed above, they did not notify Scottsdale until after the lawsuit was dismissed. (Docket No. 17 at 33.) The Court agrees that the Policy's explicit terms bar Plaintiffs' Claims for the costs of defense.

Based on the above considerations, the Court finds that Plaintiffs are unlikely to succeed on the merits of their claim.

## II.       Immediate and irreparable injury

Next, the Court considers whether Plaintiffs would suffer irreparable injury in the absence of their requested injunctive relief. *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc) (quoting *Sandison v. Mich. High Sch. Athletic Assn'n*, 64 F.3d 1026, 1030 (6th Cir. 1995)). "The irreparable harm to the plaintiff if there is no preliminary injunction is balanced against any injuries likely to be suffered by the defendant(s) if a preliminary injunction is granted." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982). "[A] plaintiff's harm is not irreparable if it is fully compensable by money damages. However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citation omitted).

The Supreme Court has explained, "[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 89 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)).

The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at the later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Va. Petrol. Jobbers Ass'n. v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).) That is, a showing that money damages will not adequately compensate the alleged harm is a showing that the harm is "irreparable." Furthermore, the anticipated harm must be "actual and imminent" rather than speculative or unsubstantiated. *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

Plaintiffs argue that the failure to receive defense costs under their business management liability policy constitutes an immediate and direct injury sufficient to satisfy this requirement. They contend that a holding to the contrary would fail to provide them with the protection from financial harm that motivated them to purchase the Policy. Additionally, they claim that without the requisite funds to pay their counsel, they will suffer default or other adverse rulings— resulting in not only financial harm, but also nonmonetary damages including damage to their reputation, the stress associated with litigation, and the risk of financial devastation.

The Court disagrees with this characterization of the potential harm. To some degree, financial pressure, the potential for adverse rulings, and the stress of litigation accompany virtually every lawsuit. If the Court were to consider these injuries irreparable harm, it would

invite virtually every litigant to resort to the courts to compel insurers to pay. Such conditions cannot constitute irreparable injury.

Any potential remaining injury, then, is purely monetary and does not constitute irreparable harm. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "[F]inancial harm such as this, short of the prospect of imminent bankruptcy, is not irreparable harm for purposes of awarding preliminary injunctive relief." *Bondex Intern., Inc. v. Hartford Acc. & Indem. Co.*, 2006 WL 2057349, at *1 (N.D. Ohio July 21, 2006) (internal quotations omitted). Therefore, Plaintiffs have failed to show irreparable harm warranting the extraordinary remedy of preliminary injunctive relief.

## III.     Harm to others and service of the public interest

Turning to the final factors required for injunctive relief, the Court finds that issuance of an injunction would cause harm to Scottsdale by subjecting it to financial liability for Claims that it appears to have neither approved nor agreed to assume. Moreover, the public interest will be unaffected if Plaintiff's Motion for Preliminary injunction is denied.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that Plaintiffs have not carried their burden of proving that the circumstances here demand injunctive relief. *See Overstreet*, 305 F.3d at 573. Therefore, the Court will decline to issue a preliminary injunction. Accordingly, having considered the Plaintiffs' instant Motion and being otherwise sufficiently advised;

IT IS HEREBY ORDERED that Plaintiffs' Motion for Temporary Restraining Order, (Docket No. 13), is DENIED.