UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00173-TBR

C.A. JONES MANAGEMENT GROUP, LLC,
GLOBAL BOOK RESELLERS, LLC,
TECHNOLOGY ASSOCIATES, INC.,
CHARLES A. JONES and SARAH C. JONES                                               Plaintiffs,

v.

SCOTTSDALE INDEMNITY COMPANY                                                      Defendant.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the motion for reconsideration filed by Scottsdale Indemnity Company, (Docket No. 30), to which Plaintiffs C.A. Jones Management Group, LLC, Global Book Resellers, LLC, Technology Associates, Inc., Charles A. Jones, and Sarah C. Jones responded, (Docket No. 35), and Scottsdale replied, (Docket No. 42). Fully briefed, this matter stands ripe for adjudication. Because the Court's Memorandum Opinion failed to address the arguments set forth in Scottsdale's surreply, it will do so now. For the reasons set forth below, the Court will GRANT Scottsdale's motion for reconsideration, (Docket No. 30).

**Factual Background**

The Court will briefly revisit the issues raised in this insurance coverage dispute. Plaintiffs allege that Scottsdale breached an insurance contract by failing to provide coverage in defense of two federal court actions: *David Griffin v. Charles A. Jones, Sarah C. Jones, C.A. Jones Management Group, LLC, Global Book Resellers, LLC, Technology Associates, Inc., and John Doe Entities 1-10*, Civil Action No. 5:12-cv-00163-TBR, and *Robert H. Waldschmidt, Trustee v. C.A. Jones Management Group, LLC, Charles A. Jones, and Scott Wright*, USBC MDTN, Adv. Proc. No. 3:13-ap-90101. After Scottsdale

1

denied their claim, Plaintiffs filed a preliminary injunction requesting an order requiring Scottsdale to provide legal representation and coverage for these actions.

At issue was the Business and Management Indemnity Policy that Scottsdale issued to C.A. Jones Management Group, LLC ("C.A. Jones") and several of its affiliates. The Policy provided coverage for the benefit of the entities' directors and officers ("D&O coverage") and included payment for:

> Loss of the Directors and Officers for which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period . . . and reported to the Insurer pursuant to Section E.1 herein, for any Wrongful Act taking place prior to the end of the Policy Period.

This Policy initially ran from July 1, 2011, to July 1, 2012 ("the 7/1/11 Policy"). A second Policy was issued to C.A. Jones on July 1, 2012 ("the 7/1/12 Policy"). Both the 7/1/11 and the 7/1/12 Policies are "claims-made" policies; that is, in order to be covered, a claim must be made and reported during the applicable Policy Period for any alleged wrongful act that occurred prior to the end of the Policy Period. The Notification section requires the Insureds to notify the Insurer of any claim no later than sixty days after the end of the Policy Period. *See* Docket No. 17-1 at 28.)

The claim at issue concerns a series of lawsuits that arose from the soured business relationship of David Griffin and Charles Jones. On February 28, 2012, Griffin first sued C.A. Jones Management, Charles Jones, Sarah Jones, and affiliated companies for securities fraud, breach of fiduciary duty, fraud, misappropriation, breach of contract, and unjust enrichment. (*See* Case No. 5:12-cv-00033-TBR, hereinafter "Griffin I.") Griffin then filed a second lawsuit against Plaintiffs on November 2, 2012, alleging securities fraud, fraud, breach of fiduciary duties, misappropriation, and unjust enrichment. (*See* :12-cv-00163-TBR, hereinafter "Griffin II.") A third lawsuit, filed March 3, 2013, arises from similar facts to those alleged in Griffin II. (*See Robert H. Waldschmidt, Trustee v. C.A. Jones Management Group, LLC, Charles A. Jones, and Scott Wright*, UBSC MDTN, Adv. Proc. No. 3:13-ap-90101, hereinafter "the CBR Trustee case").

The initial question before the Court concerned whether coverage existed. Scottsdale contended that the Policy did not cover Plaintiffs' claims based on Griffin I, Griffin II, or the CBR Trustee case, as these claims were not reported during the Policy Period when they were first made. The Court concluded that Griffin I, Griffin II, and the CBR Trustee cases constituted a single claim, as the cases shared a common nexus of facts, circumstances, situations, events, transactions, and causes and thus constituted an interrelated wrongful act. This claim was required to be reported to Scottsdale during the Policy Period when first alleged. (*See* Docket No. 17-1 at 27-8, D&O Policy, ¶ D.3(a).) The claim—that is, the civil proceeding against the insureds—was deemed to have been first made on February 28, 2012, when the Griffin I complaint was filed. (*See* Docket No. 17-1, Endorsement No. 15; Docket No. 17-2, Endorsement No. 16 ("A Claim shall be deemed to have been first made against the Insureds on the date an Insured who is an executive officer, director or general counsel becomes aware of such Claim.").) Because the claim arose prior to the commencement of the 7/1/2012 Policy, any coverage would necessarily arise under the 7/1/2011 Policy.

As the Court explained in its prior Memorandum Opinion, the Policy unequivocally requires Insureds to comply with the sixty-day notification period "as a condition precedent to the rights to payment." (Docket No. 17-1 at 28, D&O Coverage Section, ¶ E.1.) Accordingly, the Policy required Plaintiffs to have made these claims within sixty days after the end of the 2011 Policy Period. Although documentary evidence details each communication from Plaintiffs notifying, reporting, or advising Scottsdale of potential claims related to this litigation, none reflects that Plaintiffs timely reported the Griffin I claim. (*See* Docket No. 17-5 at 5-6.) Rather, Scottsdale was notified of the claim on September 25, 2012, more than sixty days after the end of the Policy Period and after the case's dismissal. (*See* Docket No. 19-1 at 32.) This date was neither as soon as practicable nor within the sixty-day window following the 2011 Policy Period.

**Analysis**

a. **The reasoning of *Trek* and of *Tussey***

In its previously entered Memorandum Opinion, the Court denied Plaintiffs' motion for preliminary injunction. The Court determined that various Policy exclusions and limitations likely precluded coverage of the claims, leaving Plaintiffs unable to demonstrate the likelihood of success on the merits requisite to a preliminary injunction. As the prevailing party, Scottsdale offers no criticism of the ultimate denial of the Plaintiffs' motion. However, the Company takes issue with the Court's threshold determination that the Claims were covered at all—an initial question that must be resolved before considering any limitations or exclusions.

The discussion hinged upon the distinction between an occurrence-based policy and a claims-made policy. Scottsdale's claims-made policy provided coverage for any claim made against the insureds during a certain period, regardless of when the incident giving rise to the claim actually occurred. "Claims-made . . . policy are essentially reporting policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches." *Trek Bicycle Corp. v. Mitsui Sumitomo Ins. Co., Ltd.*, 2006 WL 1642298, at *2 (W.D. Ky. June 7, 2006). Such a policy is distinct from an "occurrence" policy, which provides coverage for incidents that *occur* during the specified period, regardless of when the claim is made. *Id.*

This distinction is important in light of the notice-prejudice rule, which states that if an insurer attempts to escape coverage by alleging insufficient notice, the insurer must demonstrate that it was prejudiced by the faulty notice. *See Jones v. Bituminous Cas. Corp.*, 821 S.W.2d 798 (Ky. 1991). As explained in the previous Memorandum Opinion, this Court considered the effect of the notice-prejudice rule in the context of a claims-made policy in *Trek*. When *Trek* was decided in 2006, no Kentucky case addressed the application of the notice-prejudice rule to a claims-made policy. Therefore, the Court anticipated that the Kentucky Supreme Court would adopt the majority rule of its sister jurisdictions, which held that "under a claims-made policy, failure to notify within the specified time period will defeat

4

coverage." *Id.* at * 2 (citations omitted). This principle is both widely accepted and soundly reasoned. As explained by a Florida court:

> With claims-made policies, the very act of giving an extension of reporting time after the expiration of the policy period . . . negates the inherent difference between the two contract types. Coverage depends on the claim being made and reported to the insurer during the policy period. Claims-made or discovery policies are essentially reporting policies. If the claim is reported to the insurer during the policy period, then the carrier is legally obligated to pay; if the claim is not reported during the policy period, no liability attaches. If a court were to allow an extension of reporting time after the end of the policy period, such is tantamount to an extension of coverage to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties. This we cannot and will not do.

*Id.* (omission added) (quoting *Gulf Ins. Co. v. Dolan Fertig & Curtis*, 433 So.2d 512 (Fla. 1983)).

*Trek* explained that to allow coverage when the insured failed to give notice within the policy period "simply rewrites the policy." *Id.* at 3. "The advantage of a claims made policy is that the insurer and the insured know their exposure at a fairly certain time. Consequently the insurer is better able to predict the limits of the exposure and more accurately to estimate the premium schedule necessary to accommodate the risk undertaken." *Id.* To allow coverage for claims reported after the end of the policy period would effectively disregard the distinction between claims-made and occurrence-based policies. Accordingly, the Court predicted that if confronted with this issue, the Kentucky Supreme Court would hold that failure to notify within the designated period defeats coverage under a claims-made policy. *See id.* at 2.

Four years after *Trek*, the Kentucky Court of Appeal considered the notice-prejudice rule in the context of a claims-made policy in *AIG Domestic Claims, Inc. v. Tussey*, 2010 WL 3603844 (Ky. App.

Sept. 17, 2010), an unpublished decision.[1]  At the end of the first policy period, the policy at issue in *Tussey* was immediately renewed, thus providing seamless coverage.  The insured made a claim under the first policy but failed to provide notice until after the first policy period had expired.  Consequently, the insurer denied coverage, reasoning that claims not reported within the relevant policy period were not covered.

The Kentucky Court of Appeals rejected this rationale.  The court looked to the policy provision that entitled an insured whose policy was either cancelled or not renewed to purchase a "discovery period" for an additional premium.  If purchased, this option allowed the insured to give notice of any claim made during a twelve-month period after the cancellation or non-renewal.  The court emphasized that this option was available only to those whose policies were cancelled or not renewed, thus suggesting that those who renewed their policies had no need to purchase an extension, because their coverage would be continuous.

*Tussey* acknowledged the insurer's argument that claims-based policies are generally offered at a lower premium because of the policy's limits:  only claims made and reported during the policy period are covered.  By contrast, an occurrence policy bears a higher premium "because of the insurer's exposure to indefinite future liability."  *Id.* at *3.  Despite this distinction, though, *Tussey* found it "difficult to fathom that a claim accruing during the two policy periods would not be covered by either policy."  *Id.* (citation omitted).  Following the insurer's logic, *Tussey* held, would mean that an insured that renews its policy would have no way to protect against claims made after the first policy expired.  "This conclusion is both illogical and inequitable," the court said.  Therefore, it held that renewal of the policy provided seamless coverage to the insured.

This Court relied upon *Tussey* in its previous Memorandum Opinion in the instant case. Applying *Tussey*'s reasoning, the Court found that although Plaintiffs notified Scottsdale of the Griffin I

---

[1] Although the Kentucky Supreme Court originally granted discretionary review of *Tussey*, this appeal was dismissed upon the parties' joint motion on September 14, 2011.  *See Nat'l Union Fire Ins. Co . v. Pike Co. Bd. of Educ.*, No. 2010-SC-000827 (Docket No. 27).

claim in the second policy period, the policy provided seamless coverage and rendered Griffin I a covered claim. Because Griffin II and the CBR Trustee case constituted interrelated wrongful acts under the policy, they constituted part of the same claim as Griffin I. The policy provides that all claims arising out of the same wrongful act and all interrelated wrongful acts will be deemed to have been made at the earlier of either "the time at which the earliest claim involving the same Wrongful Act or Interrelated Wrongful Act is first made" or "the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made." (Docket No. 17-1 at 27-8, D&O Policy, ¶ D.3(a).) Therefore, Plaintiffs were deemed to have notified Scottsdale of Griffin II and the CBR Trustee claim when they gave notice concerning Griffin I. Accordingly, the Court found that the policy covered each of the three lawsuits.

### b. *Tussey's* persuasive value

Although the Court's previous Memorandum Opinion looked to the *Tussey* reasoning for guidance, such consideration was not required. "In determining Kentucky law only the decisions of the highest court of Kentucky bind this Court." *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 691 (W.D. Ky. 2001) (citing *Comm'r of Internal Revenue v. Bosch*, 387 U.S. 456, 465 (1967)). Although the holdings of other Kentucky courts may suggest what the Kentucky Supreme Court might do, they are not "absolute predictors" and are not controlling. *Id.* (citations omitted). Moreover, the unpublished opinions of Kentucky's Court of Appeals do not constitute binding precedent. *See* Civil Rule 76.28(4)(c).

Rather, a federal court construing questions of Kentucky law must apply the state law in accordance with the controlling decisions of the Kentucky Supreme Court. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co .v. Tompkins*, 304 U.S. 64 (1938)). If the Kentucky Supreme Court has not addressed the issue—as is the case here—the Court must predict how the Commonwealth's highest court would rule on the matters at hand. In so doing, the Court may look to "the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making

7

this determination." *Id.* (citing *Grantham & Mann v. Am. Safety Prods.*, 831 F.2d 596, 608 (6th Cir. 1987)). The federal court may depart from the intermediate appellate court's decision only if it is convinced that the state's highest court would decide otherwise. *See id*; *see also Clutter v. Johnson-Manville Sales Corp.*, 646 F.2d 1151, 1153 (6th Cir. 1981) (holding that "[i]f the state appellate court announces a principle and relies upon it, that is a datum not to be disregarded by the federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

Kentucky case law dictates that to recover for a breach of contract, a plaintiff must demonstrate the existence and breach of a contractually imposed duty. *Strong v. Louisville & Nashville R.R. Co.*, 43 S.W.2d 11, 13 (1931). Courts must afford an insurance contract its plain meaning, looking to its "true character and purpose, and the intent of the policies." *Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co.*, 113 F.3d 629, 636 (6th Cir. 1997). Although the Court will construe any ambiguities in an insurance contract in favor of the insured, if the policy's terms are clear and unambiguous, the policy must be enforced as written. *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 227 (Ky. 1994); *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries*, 82 S.W.3d 869, 873 (Ky. 2002).

These foundational principles undermine *Tussey*'s persuasive value. *Tussey* departs from a long-held principle of Kentucky insurance law instructing courts construing an insurance policy to look to the language of the policy itself. *See* KRS § 304.14-360 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy . . . ."). There has been no contention that the policy's language was vague, and the majority of courts addressing similar claims have found them to be clear and enforceable. *See, e.g.*, *United States v. Strip*, 868 F.2d 181, 186-87 (6th Cir. 1989) (finding that policy with explicit claim reporting requirement was not ambiguous).

Applying that reasoning here requires that even if an insured purchases consecutive claims-made policies with the same insurer, he must nonetheless satisfy the reporting requirements provided in the policy. As Judge Wine emphasized in his *Tussey* dissent, the reporting period requirement is the key

8

distinction between claims-made and occurrence-based policies. *Tussey* essentially created an extended reporting period for claims-based policies, thus generating "'a long and unbargained-for tail of liability exposure, the avoidance of which forms the conceptual framework' for claims-based coverage in the first place." *Tussey*, 2010 WL 3603844 (Wine, J. dissenting) (quoting *CheckRite Ltd. v. Illinois Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 194 (S.D.N.Y. 2000) (internal quotations omitted)).

Judge Wine noted that the majority's decision was contrary to precedent from an "overwhelming majority of jurisdictions all over this country." *Id.* (citing *CheckRite*, 95 F. Supp. 2d 180; *Nat'l Union Fire Ins. Co. v. Bauman*, 1992 WL 1738, at 10 (N.D. Ill. Jan. 2, 1992); *Ehrgood v. Coregis Ins. Co.*, 59 F. SUpp. 2d 438, 446 (M.D. Pa. 1998); *Pantropic Power Prods. v. Fireman's Fund Ins. Co.*, 141 F. Supp. 2d 1366 (S.D. Fla. 2001); *Gulf Ins. Co. v. Dolan Fertig & Curtis*, 433 So. 2d 512 (Fla. 1983); *U.S. v. A.C. Strip*, 868 F.2d 181 (6th Cir. 1989). Post-*Tussey* cases confirm that renewal of a claims-made policy does not modify the notification requirement. *See, e.g.*, *GS2 Eng'g & Envntl. Consultants, Inc. v. Zurich Am. Ins. Co.*, 956 F. Supp. 2d 686, 693 (D.S.C. 2013). Similarly, the Western District of Michigan rejected an insured's claim under Michigan law that he was entitled to continuous coverage so long as he continuously renewed his claims-made policy: "[The insured] was not contracting for an extended reporting period when he renewed his insurance policy . . . . Extending the reporting period . . . would be giving [the insured something for which he did not bargain." *Boerman v. Am. Empire Surplus Lines Ins. Co.*, SD No. 4:00-CV-172 (W.D. Mich. 10-2-01).

The Court finds that the *Tussey* dissent more closely adheres to the unambiguous meaning of the policies at issue, as expressed in their actual and clear language. The Court further concludes that the Kentucky Supreme Court would apply such reasoning to this case, thus excluding coverage under the Plaintiffs' Scottsdale policy—which unmistakably advises that a claim must be made and reported during the same policy period in order to be covered. Looking to the Policy's clear and unambiguous language, the Court finds that Plaintiffs' claims were not covered. *United States v. Strip*, 868 F.2d 181 (6th Cir. 1989).

**Conclusion and Order**

Among the bases for which a motion for reconsideration raised under Federal Rule of Civil Procedure 59(e) may be granted are "a clear error of law" and "a need to prevent manifest injustice." *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 496 (6th Cir. 2006). In this instance, the Court agrees with Scottsdale that a manifest injustice would result from adoption of the *Tussey* reasoning here. Accordingly, IT IS ORDERED that Scottsdale's motion for reconsideration, (Docket No. 30), is hereby GRANTED in accordance with the analysis provided above.